**Opinion filed March 12, 2026**



## In The

# Eleventh Court of Appeals

_____

### No. 11-24-00239-CR

_____

### AASHAUD MCVEA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 23559-B**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant, Aashaud McVea, guilty of murder, a first-degree felony, and assessed his punishment at forty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. § 19.02(b), (c) (West Supp. 2025). The trial court sentenced Appellant accordingly.

In six issues, Appellant argues that the trial court erred because: (1) the evidence supported his self-defense claim; (2) the trial court abused its discretion in refusing to instruct the jury on defense of a third person; (3) the court reporter was allowed to read testimony to the jury during deliberations; (4) the trial court overruled his motion for mistrial after a witness violated Appellant's motion in limine; (5) the trial court admitted evidence of Appellant's juvenile adjudication; and (6) the trial court overruled his objection to the State's closing argument during the punishment phase. We affirm.

## I. *Factual and Procedural Background*

Abilene Police Department (APD) Officer Matthew Santos heard gunfire in the early morning hours of March 29, 2022. About four minutes later, he received a dispatch call with an address located in the 400 block of La Salle. Officer Santos arrived to find multiple people standing outside a residence belonging to Kara Jones, Appellant's mother. A man who had sustained several gunshot wounds, later identified as Isaiah Arellano, was lying unresponsive, face down in the driveway. A gun lay next to Arellano. A few feet in front of Arellano was an unoccupied vehicle still in gear with the front passenger and rear passenger doors wide open.

Close-in-time, approximately two blocks away from the residence, an injured man later identified as Isaac Rodriguez appeared on-foot at MetroCare emergency services asking for help. Rodriguez had sustained two bullet wounds and was transported to a nearby hospital.

Rodriguez, nineteen years old at the time of trial, testified that on the evening of March 28, 2022, he had been attempting to sell a gun, a SIG Sauer,[1] that he alleged to have recently purchased from a relative. After making a post on Instagram, he

---

[1] The SIG Sauer was determined to have been stolen; Rodriguez was not arrested in connection with the firearm theft.

received a response from an individual named Phillip Lewis. The two men agreed to meet at a residence on La Salle.[2] Rodriguez's older cousin, Arellano, drove him. After initially arriving at the wrong residence, and following some back-and-forth communication between Rodriguez and Lewis, Arellano pulled into the correct residential driveway where Appellant was outside waiting.

Rodriguez testified that Appellant approached the vehicle, and entered the vehicle by the right rear passenger door and asked to see the gun. Rodriguez then handed Appellant the loaded gun. As Appellant inspected the weapon, Rodriguez was about to turn his attention elsewhere when he heard the sound of a gun cocking and then gunshots. Realizing that he had been shot, Rodriguez froze for "a good five seconds" before running from the vehicle. Rodriguez testified that he felt a bullet strike him as he ran.[3] Rodriguez testified that at no point had Arellano looked at Appellant, said anything to him, or pulled out his own concealed handgun that he had been carrying.

Three handguns were recovered that evening: a SIG Sauer and Taurus from inside the residence and a SAR 9 lying near Arellano. No shell casings were recovered from inside the vehicle. There were, however, two spent casings found near the right rear passenger door of the vehicle and five casings leading up to Appellant's front door. Of the seven casings recovered, all were determined to have been fired from the SIG Sauer handgun.

Testimony was presented regarding the results of DNA testing performed on the three handguns. Brent Hester, a DNA analyst with the Texas Department of

---

[2]Text messages between Lewis and Rodriguez were admitted into evidence. In the texts, Lewis expressed apprehension about the meet up and inquired who would be joining Rodriguez, even asking for a picture of Rodriguez's cousin. When Rodriguez suggested they could instead meet "somewhere where there's people around" or at Rodriguez's residence, Lewis responded, "No. It's good. Come to me."

[3]APD Detective Jeff Cowan testified Rodriguez's injuries were consistent with having been shot inside the vehicle and then in the back as he fled.

Public Safety, testified that the SIG Sauer possessed a DNA profile mixture of two individuals. Appellant was identified as a possible DNA contributor. Appellant, Rodriguez, and Arellano were each excluded as contributors of the DNA profile mixture found on the Taurus handgun. While Appellant and Rodriguez were excluded as contributors of the DNA profile mixture found on the SAR 9, Arellano was identified as a possible contributor. Each gun was also tested for functionality, and no malfunctions were detected.

Having conducted Arellano's autopsy, Dr. Stephen M. Hastings, a forensic pathologist with the Dallas County Medical Examiner's Office, testified that Arellano had sustained four gunshot wounds. One bullet entered the left side of Arellano's chest, perforating Arellano's diaphragm, traveling through the transverse colon into the pancreas, then the aorta, the right kidney, the liver, the diaphragm again, and exiting through Arellano's back ribs. The next gunshot wound was located about half an inch below the entrance to the first described wound, but there was no damage to Arellano's organs in relation to this bullet. This bullet was found lodged in Arellano's left flank. A third and fourth bullet entered Arellano's left thigh. While the third entry wound had a corresponding exit wound, the fragments of the fourth bullet were found in Arellano's thigh.

Appellant spoke to police on the evening of the murder, providing multiple inconsistent accounts about what had transpired. According to APD Sergeant Jordan Brown, Appellant's first statement involved an escalating tension between the occupants of two vehicles, with Appellant giving the names of the occupants in the second vehicle, which changed as his story developed. Appellant then claimed to have been inside the house "peeking out" the door when the gunshots went off. Appellant then denied seeing the shooting altogether. By what the State characterized as Appellant's sixth or seventh story, Appellant told officers that Lewis had arranged a meetup outside Appellant's residence for the purpose of

buying a gun. Appellant entered Rodriguez's vehicle and Appellant maintained that Rodriguez started playing around with the gun but had dropped it into the back floorboard. When Appellant leaned over to pick up the gun, Arellano reportedly put a gun to Appellant's head and pulled the trigger, but Arellano's gun malfunctioned. Appellant said that he then shot Rodriguez and Arellano. Detective Cowan noted that Appellant did not have any money on him even though he was there to purchase a firearm.

Screenshots taken from Appellant's cell phone were admitted into evidence at trial. In a message sent from Appellant to an unknown individual on March 28 at 11:32 p.m., Appellant asked for "some licks," which APD Detective Michael Scott testified was "slang for basically obtaining money, typically through illegal means" such as a robbery. Shortly before midnight, Appellant had also messaged Lewis asking, "Werw da licks?" and "[o]n who . . . wat I got to do." Appellant called Lewis, then texted his address and asked if the individual would be "by hisself." After another call, Appellant messaged Lewis, "Bro, see who the f--k his cousin is and stop being dumb." Another call ensued, after which Appellant informed Lewis, "He's not outside." Shortly after midnight, Appellant texted another party that he had just received a "play on a stick," which Detective Scott explained was an "opportunity on a gun." The last message sent to Lewis was at 12:50 a.m., directing him to "Unsend them messages."

At trial, Appellant testified that he knew that Lewis and Rodriguez had arranged for the gun transaction at his residence but, contrary to his text messages, said it had been without his input. Appellant was outside on his porch waiting for Rodriguez when Rodriguez and Arrellano pulled up into the driveway. After Rodriguez motioned for Appellant to get into the vehicle, Appellant got into the right rear passenger seat. Appellant testified that he left the back passenger door open because Rodriguez also had opened the front passenger door, an action Appellant

5

found suspicious. Appellant then asked to see the gun and Rodriguez handed him the loaded gun. Appellant testified that he handed the gun back to Rodriguez after inspecting it, and Rodriguez began whispering to Arellano. Arellano was leaning over the steering wheel during this exchange, and it was then that Appellant noticed Arellano was armed. Appellant testified that he felt the two men were trying to "play" him because Arellano was "smiling and grinning . . . for no reason." Appellant had taken out his cell phone to text Lewis when the "next thing [he] knew," Rodriguez "tried to turn around fast, like he wanted the gun pointed" but dropped the gun, which fell on the backseat floorboard. As Appellant leaned down to pick up the gun, he felt the barrel of a gun pressed against his forehead by Arrellano. Appellant testified that in that moment, he thought, "it's life or death now," "me or him." While Arellano struggled to use his gun, Appellant fired his first shots. Appellant testified that Rodriguez then ran, and Appellant shot at Rodriguez, not knowing if Rodriguez was still armed and "scared for" his then-girlfriend, Jare'nya Carr, who was in the bedroom closest to the backyard. Appellant exited the vehicle and continued shooting at Rodriguez. Then, Appellant noticed Arellano trying to exit the vehicle with a gun still in his hand. Appellant ran toward his house, firing shots at Arellano. Appellant saw Arellano fall to the ground and fired one more shot before going inside.

When asked why he had provided so "many versions" to law enforcement about what transpired that night, Appellant testified that he "didn't trust talking to the police," he was scared, and he was tired. Appellant testified that he eventually told the truth and denied ever planning to rob Arellano and Rodriguez. Appellant explained that he had no money with him because money was supposed to be exchanged via an app between Lewis and Rodriguez. Appellant further testified that in retrospect, he had likely been "setup" by Lewis.

After maintaining that he had little or no familiarity with guns and stating he had only ever shot a gun once, the week prior, the State impeached Appellant with his prior juvenile adjudication of aggravated assault with a firearm. The jury was provided with a limiting instruction immediately after.

At trial, Jones, Carr, and Appellant's grandmother, Kerran Woods, also testified. All three said they had been asleep inside the residence at the time of the shooting. After hearing gunshots and running to the living room, they witnessed Appellant enter the home, screaming and crying that someone had been "trying to kill" him. Carr testified that she saw Appellant with a gun in his hand and took it from him unprompted, wrapped it in a cover, and placed it in a laundry basket inside Appellant's room. Jones, finding a gun in Appellant's laundry basket, put the gun in a bag inside her bedroom drawer. Though not initially forthcoming with police regarding the gun she had found, Jones eventually told police where she had hidden the gun. Jones also said she had been the one to advise Appellant to shower before police arrived and stated that it had been suggested because he was "in a panic and scared" and she was "trying to get him to calm down." Carr put Appellant's clothes in the washer but testified at trial that she could not recall why she had done so.

At the conclusion of trial, Appellant received a self-defense instruction and requested a defense of a third-party instruction. His trial counsel argued that Appellant had "testified several times that he was concerned about his family in the house at that time." The trial court denied Appellant's request.

After the jury retired to deliberate, the trial court received notice of a jury note asking that the court reporter read back a portion of Rodriguez's testimony. The note stated, in part, "Jurors are unsure if [Rodriguez] dropped the gun into the backseat or if he handed the gun to the defendant." Appellant objected, arguing that there was no clear disagreement among the jurors and by reading the transcript, the

reporter would become a witness for the prosecution. The trial court overruled Appellant's objection and a short portion of Rodriguez's testimony was read.

The jury returned a guilty verdict. Following the punishment phase, the jury rejected Appellant's sudden passion defense and assessed his punishment at forty-five years' confinement. This appeal followed.

## II. *Self Defense*

In Appellant's first issue, he contends that there was insufficient evidence to support the jury's rejection of his self-defense claim.

### A. *Standard of Review and Applicable Law*

Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). A defendant has the burden of producing some evidence to support a defense claim. *Braughton*, 569 S.W.3d at 608; *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence supporting his self-defense claim, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. Because the State must disprove a defense claim by establishing its case beyond a reasonable doubt, we review legal and factual sufficiency challenges to the jury's rejection of a defense claim under the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.2d at 914.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Thus, when reviewing the sufficiency of the evidence to support a conviction involving a claim of self-defense, we review the sufficiency of the evidence to support a jury's rejection of a defendant's self-defense theory by examining all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against the defendant on the defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914 (citing *Jackson*, 443 U.S. 307).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing

9

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446. 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Relevant to this appeal, a person commits the offense of murder if the person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." PENAL § 19.02(b)(1), (2). The indictment alleged in two separate paragraphs that Appellant "intentionally and knowingly cause[d] the death of an individual, namely [ARELLANO] by shooting him in the chest," and "with intent to cause serious bodily injury to an individual, namely [ARELLANO], commit an act clearly dangerous to human life that cause[d] the death of the said [ARELLANO], by shooting him in the chest." *Id.*

In asserting self-defense, the use of force is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2019). In the same manner, the use of deadly force against another is justified under the above circumstances "if the actor would be justified in using force against the other under Section 9.31; and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A

reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id.* § 1.07(a)(42). Under certain conditions, an actor's belief that deadly force was immediately necessary is presumed to be reasonable. *Id.* § 9.32(b).

B. *Analysis*

While Appellant concedes that he shot Arellano, he asserts that the jury should have accepted his self-defense theory because the evidence showed that Arellano and Rodriguez had come to his home with the express intention of shooting him. Appellant argues he had entered the vehicle unarmed, and it was only when he had a gun barrel pressed against his forehead that he picked up the gun Rodriguez had dropped and used it to shoot Rodriguez and Arellano. Appellant maintains that the shell casings scattered in the driveway, and Arellano's body found near a gun are all consistent with his testimony.

The State counters that "[e]ven when some evidence is consistent with Appellant's version, the jury was not required to accept Appellant's claim and version of events as true simply because some evidence supported it." The State asserts that Appellant's version of events was controverted by Rodriguez's testimony and further notes that much of Appellant's testimony "does not make sense." For instance, Appellant and Rodriguez both testified that Rodriguez handed Appellant a loaded gun to inspect, an inexplicable action if Rodriguez and Arellano were intent on shooting Appellant. The State additionally argues that Appellant had credibility issues, as his story to law enforcement changed repeatedly, a fact Appellant conceded at trial. We agree.

There is ample evidence in the record that supports the jury's rejection of Appellant's claim of self-defense. In addition to the points raised by the State in its brief, the record contains messages from Appellant indicating he had been looking for some "licks" hours before the shooting, which Detective Scott testified is slang

for "obtaining money, typically through illegal means," such as a robbery. Notwithstanding Appellant's testimony that he shot Arellano and Rodriguez inside the vehicle immediately after Arellano had attempted but failed to shoot him because his weapon had malfunctioned, Arellano's weapon was tested for functionality and no malfunctions were detected. Moreover, the physical evidence—i.e., the absence of casings or blood inside the vehicle—renders Appellant's version of events less likely. The record further indicates that Rodriguez and Arellano were shot as they attempted to put distance between themselves and Appellant. Though armed, Arellano was found behind his vehicle—away from Appellant's home. Appellant's admission that he saw Arellano collapse and continued shooting, coupled with the five casings recovered on Appellant's front lawn leading toward his front door, indicates that Arellano was shot while attempting to put additional distance between himself and Appellant.

This is all evidence upon which the jury could have reasonably concluded that Appellant did not believe deadly force was immediately necessary to protect himself from Arellano's purported use of unlawful deadly force. The jury was free to judge the credibility and weight of all the evidence presented, and the record supports the jury's rejection of Appellant's theory. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the State presented sufficient evidence from which a rational trier of fact could have found, beyond a reasonable doubt, all of the essential elements of murder and also could have rejected Appellant's claim of self-defense. We overrule Appellant's first issue.

## III. *Charge Error*

In Appellant's second issue, he argues that the trial court erred by refusing to submit to the jury a requested charge on defense of a third person.

12

A. *Standard of Review and Applicable Law*

A review of alleged charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether the charge contains any actual error; second, if there is actual error, we must determine whether the error resulted in sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. Where, as here, the defendant preserved the error by timely objecting to the charge, an appellate court will reverse so long as the defendant demonstrates that he suffered some harm. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. *See* CRIM. PROC. art. 36.14 (West 2007). The trial court must give a requested instruction on "every defensive issue raised by the evidence, regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court thinks that the testimony is not worthy of belief." *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). If there is some evidence on each element of the defense that, if believed by the jury, would support a rational inference that each element is true, then the defense has been raised. *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). By contrast, a trial court is under no obligation to provide an instruction in its charge on matters not raised by the evidence. *See Harris v. State*, 645 S.W.2d 447, 456 (Tex. Crim. App. 1983).

Defense of a third person is a defense to prosecution. *See* PENAL § 2.03 (West 2021), § 9.02, 9.33 (West 2019); *Smith*, 355 S.W.3d at 144. Under Section 9.33, the defense of a third person provision of the Texas Penal Code states:

> A person is justified in using force or deadly force against another to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

PENAL § 9.33. In effect, a person defending another stands in the "shoes of the third person." *Jimenez v. State*, 298 S.W.3d 203, 208 (Tex. App.—San Antonio 2009, pet. ref'd); *see Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011).

B. *Analysis*

Appellant asserts that he was entitled to a charge on defense of a third person based on his testimony that the shooting occurred right outside his family home, and after Appellant began shooting, Rodriguez "ran toward [his] house, at [his] back gate." Appellant testified that not knowing that Rodriguez was unarmed, he got "scared for" Carr. This testimony alone, however, does not raise a defense of a third person. One requirement for the defense of third persons is that the defendant believes his action is *immediately* necessary to protect the third person from the *victim*. *Alvarez v. State*, No. 11-17-00282-CR, 2019 WL 6210468, at *3 (Tex. App.—Eastland Nov. 21, 2019, pet. ref'd) (mem. op., not designated for publication); *see Estrada v. State*, No. 09-23-00107-CR, 2025 WL 1057215, at *10 (Tex. App.—Beaumont Apr. 9, 2025, no pet.) (mem. op., not designated for publication) ("When there is no evidence that the victim was making an attack or threatening an immediate attack upon a third party, the issue of defense of third person is not raised."). Appellant was on trial for the murder of Arellano and points to no evidence that he acted in furtherance of protecting a third person from Arellano. To the contrary, Appellant stated unequivocally that he shot Arellano in fear of his own life: "it could be me or him." It is also what he told his family immediately

14

after the shooting and what he told officers. Moreover, Appellant's testimony does not establish that either Arellano *or* Rodriguez even knew of the presence of Appellant's family in the home, much less attacked or made any threats of harm against them to require immediate protection. *See, e.g., Pena v. State*, 635 S.W.2d 912, 914 (Tex. App.—Eastland 1982, pet. ref'd) (rejecting applicability of defense of a third person where "[t]here was no testimony that the decedent had directed any threats of any kind toward" the third parties); *Valdez v. State*, No. 14-22-00555-CR, 2024 WL 378528, at *5 (Tex. App.—Houston [14th Dist.] Feb. 1, 2024, no pet.) (mem. op., not designated for publication) ("The evidence must show that the victims attacked or made threats against the third person in order to raise the issue of defense of third person.").

Viewed in the light most favorable to Appellant's requested instruction, we conclude that the evidence does not raise the issue that Appellant reasonably believed his intervention with deadly force was immediately necessary to protect a third person, and therefore, the trial court did not err by denying the requested instruction. *See* PENAL §§ 9.32(a)(2)(A), 9.33. Accordingly, we need not examine whether Appellant was harmed. *See Ngo*, 175 S.W.3d at 743–44. We overrule Appellant's second issue.

## IV. *Article 36.28*

In Appellant's third issue, he argues that the trial court abused its discretion in allowing testimony to be read to the jury during its deliberations on guilt-innocence "when the jury had not indicated there was a conflict among the jurors." *See* CRIM. PROC. art. 36.28 (West 2006).

### A. *Standard of Review and Applicable Law*

Article 36.28 of the Code of Criminal Procedure allows testimony to be read back to the jury "if the jury disagree as to the statement of any witness." *Id.* Article 36.28 "seeks to balance the concern that the trial court not comment on the

evidence with the need to provide the jury with the means to resolve any factual disputes it may have." *Balderas v. State*, 517 S.W.3d 756, 797 (Tex. Crim. App. 2016). In other words, "[t]he statute provides a precondition for reading back testimony—a jury dispute ('if the jury disagree')." *Stredic v. State*, 663 S.W.3d 646, 654 (Tex. Crim. App. 2022) (quoting CRIM. PROC. art. 36.28). However, "Article 36.28 does not require that the jury use any particular words to express its disagreement," and "[w]hether a disagreement exists will depend upon the particular facts of each case." *Balderas*, 517 S.W.3d at 798. Only when a trial court has determined that the request is proper under Article 36.28 must the trial court "interpret the communication; decide, in its discretion what sections of the testimony will best answer the query; and limit the testimony accordingly." *Id.*

"An appellate court should not disturb a trial court judge's decision under Article 36.28 unless a clear abuse of discretion and harm are shown." *Thomas v. State*, 505 S.W.3d 916, 923 (Tex. Crim. App. 2016). A trial court abuses its discretion where it acts without reference to guiding rules or principles. *Moody v. State*, 543 S.W.3d 309, 312–13 (Tex. App.—Eastland 2017, pet. ref'd). The trial court may infer a dispute if circumstances suggest that one exists. *Id.* (citing *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005)); *see Balderas*, 517 S.W.3d at 798 ("[T]he judge's inference of a dispute need only have some basis other than mere speculation.").

B. *Relevant Background*

The trial court received a note during jury deliberations that stated, "Your Honor, we would like the court reporter to read the testimony of [Rodriguez] on how the SIG Sauer was exchanged between the defendant and [Rodriguez] during the sale. Jurors are unsure if [Rodriguez] dropped the gun into the backseat or if he handed the gun to the defendant."

16

Appellant objected to the reporter reading back corresponding testimony, arguing that (1) by reading the transcript, the court reporter would become "a witness for the prosecution" and (2) while the jury had stated that "they weren't sure[, t]hey didn't say there was a disagreement." The trial court overruled Appellant's objection, and the following was read back by the court reporter:

QUESTION: Okay. So he asked for the gun. And how did you hand it to him?

ANSWER: I handed it to him -- right where the seatbelt is, right through that little hole, I handed it to him through there.

QUESTION: At some point during this time, you dropped the gun on the floor -- the floorboard of the [vehicle], correct?

ANSWER: No.

QUESTION: You never dropped the gun on the floorboard of the [vehicle]?

ANSWER: It was on the floor whenever I got -- whenever we pulled up. I had it on the floor.

QUESTION: And isn't it true you handed it to him to examine the gun?

ANSWER: Come again.

QUESTION: You handed the gun to [Appellant] to examine it?

ANSWER: Yeah, he had looked at it.

QUESTION: So that's yes?

ANSWER: Yes.

C. *Analysis*

Appellant challenges the trial court's determination that the jury's note constituted a proper request under Article 36.28. Appellant argues that the trial court's decision cannot be justified as there was only a single note from the jury

17

requesting to hear testimony with no instructions from the trial court to the jury concerning the need for the existence of a jury disagreement.

Though Appellant is correct in that the trial court did not request further clarification from the jurors, the trial court could have nonetheless inferred a disagreement here because the jury's request was for two specific options of a particular fact: was the gun dropped into the backseat or was it handed to Appellant? *See, e.g.*, *Fernandez v. State*, 915 S.W.2d 572, 573 (Tex. App.—San Antonio 1996, no pet.) (inferring disagreement where jurors sent a note which stated, "Several of us feel the Police Officer said under sworn testimony that in his opionion (sic) the defendant was intoxicated while behind the wheel of his vehicle. Was this stated by the Police Officer or not?"); *Tubbs v. State*, No. 05-11-01053-CR, 2012 WL 4950731, at *3 (Tex. App.—Dallas Oct. 18, 2012, no pet.) (not designated for publication) (inferring disagreement where jurors sent a note pointing out two differing possibilities of a complainant's testimony and narrowly tailoring their request for two specific portions of the complainant's testimony despite not explicitly indicating a disagreement). The jury's note was not so overly broad as to necessitate speculation of the existence of a disagreement. *See Balderas*, 517 S.W.3d at 798; *cf. Alvis v. State*, No. 05-09-00387-CR, 2011 WL 2120510, at *3 (Tex. App.—Dallas May 31, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding juror note stating "Request: [M.S.] Statement and ALL EVIDENCE" did not implicate Article 36.28 as there was "nothing in the record indicat[ing] the jury disagreed over any particular aspect of a witness's testimony"). Having found no abuse of discretion, we overrule Appellant's third issue.

### V. *Motion for Mistrial*

Appellant argues in his fourth issue that the trial court erred in overruling his motion for mistrial after a witness mentioned his "TYC hold" in violation of his motion in limine.

18

A. *Standard of Review and Applicable Law*

We review the denial of a motion for mistrial for an abuse of discretion. *Hallman v. State*, 721 S.W.3d 307, 313 (Tex. Crim. App. 2025). "A reviewing appellate court will 'reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'" *Id.* (quoting *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009)). We may not substitute our judgment for that of the trial court, but rather we "must decide whether the trial court's decision was arbitrary or unreasonable." *Id.* (quoting *State v. Gonzalez*, 855 S.W.2d 692, 695 n.4 (Tex. Crim. App. 1993)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

When, as here, a party moves for a mistrial, the scope of appellate review is limited to whether the trial court erred in not taking the most serious action of ending the trial. *Williams v. State*, 607 S.W.3d 131, 134 (Tex. App.—Eastland 2020, no pet.) (citing *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004)). Generally, an instruction to disregard cures any prejudice from a witness's inadvertent isolated reference to a defendant's prior offense or conviction. *Sandoval v. State*, 665 S.W.3d 496, 529 (Tex. Crim. App. 2022); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). We will not reverse for an error that could have been cured by an instruction when the complaining party did not seek lesser remedies from the trial court. *Young*, 137 S.W.3d at 70; *see also Patterson v. State*, No. 11-19-00200-CR, 2021 WL 1918876, at *4 (Tex. App.—Eastland May 13, 2021, no pet.) (mem. op., not designated for publication).

B. *Relevant Background*

At trial, the State called Brandon Adams, a former inmate, to testify regarding a conversation he overheard between Appellant and other inmates during processing. Appellant objected to the following portion of Adams's testimony:

19

[THE STATE]:  What did you hear him talking about?

[ADAMS]:  [Appellant] explained that he was currently in jail for a TYC hold, something to do with that.  But he said that the APD was trying to charge him with this said murder.

[THE STATE]:  "This said murder," did he expound on that any?

[ADAMS]:  Not at first, until a bank robbery suspect entered, then they started talking about it again.

[APPELLANT]:  Your Honor, I object to this line of questioning and request that we speak to you outside the presence of the jury.

Outside the jury's presence, Appellant argued that Adams's mention of his "TYC hold"[4] was a violation of his motion in limine.  Appellant then averred that Adams's statements should be "stricken," and he should be dismissed as a witness.  The trial court then sought to clarify if Appellant was requesting that the jury be given an instruction to disregard Adams's TYC statement.  Counsel declined, stating he was moving for a mistrial, which the trial court denied.

C. *Analysis*

The record reflects that Appellant rescinded his initial request that the testimony be stricken and rejected the trial court's offer for a limiting instruction, instead requesting only a mistrial to remedy Adams's uninvited, unembellished reference to Appellant's prior incarceration.  Texas courts, including this court, have repeatedly held that testimony disclosing that a defendant has been incarcerated can be cured by the less drastic remedy of an instruction to disregard.  *See, e.g.*, *Kemp*, 846 S.W.2d at 308 (finding that an "uninvited and unembellished reference to appellant's prior incarceration—although inadmissible—was no[t] so inflammatory as to undermine the efficacy of the trial court's instruction to disregard."); *see also Crawford v. State*, 595 S.W.3d 792, 804 (Tex. App.—San Antonio 2019, pet. ref'd)

---

[4]The acronym or meaning of the term "TYC" or "TYC hold" was not explained in the jury's presence.  We question whether the average juror would know the legal meaning, or impact, of, a TYC hold.

(concluding same where witness testified appellant "had just gotten out of prison"); *Keith v. State*, 384 S.W.3d 452, 460–61 (Tex. App.—Eastland 2012, pet. ref'd) (concluding same where witness testified appellant was on parole); *Lopez v. State*, 314 S.W.3d 70, 73 (Tex. App.—Waco 2010, no pet.) (same where witness testified appellant had previously "went to TYC"); *Kennedy v. State*, No. 12-18-00216-CR, 2019 WL 4126615, at *5 (Tex. App.—Tyler Aug. 30, 2019, pet. ref'd) (mem. op., not designated for publication) (same where witness testified appellant had "different offenses" on his record and had previously been in jail).

Because our review is limited to whether the trial court erred in not taking the most serious action of ending the trial and because a lesser, unrequested alternative would have cured any error on this issue, we cannot conclude that the trial court abused its discretion in denying Appellant's request for a mistrial. *See Ocon v. State*, 284 S.W.3d 880, 887 (Tex. Crim. App. 2009); *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009); *Clark v. State*, No. 11-22-00047-CR, 2023 WL 5622301, at *2–3 (Tex. App.—Eastland Aug. 31, 2023, no pet.) (mem. op., not designated for publication). We overrule Appellant's fourth issue.

## VI. *Impeachment*

In Appellant's fifth issue, he argues that the trial court abused its discretion in permitting the State to question him about his juvenile criminal record after he testified that, having only fired a gun the Friday before the incident, "I don't know nothing about [guns]."

### A. *Standard of Review and Applicable Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Ruiz v. State*, 631 S.W.3d 841, 855 (Tex. App.—Eastland 2021, pet. ref'd) (citing *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019)). We will not reverse a trial court's decision to admit or exclude evidence, and there is no abuse of discretion,

21

unless that decision lies outside the zone of reasonable disagreement. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). Furthermore, we will uphold a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct under any theory of law that finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

"In Texas, as in most jurisdictions, juvenile criminal records and adjudications are not admissible to impeach the general credibility of a testifying witness." *Irby v. State*, 327 S.W.3d 138, 147 (Tex. Crim. App. 2010). Although the Rules of Evidence expressly forbid the use of these types of records, Rule 609 contains an exception, explaining that this type of evidence may be admissible in certain circumstances. *See* TEX. R. EVID. 609(d). In *Andrews v. State*, we recognized one such circumstance, though in the context of an ineffective-assistance-of-counsel review. No. 11-02-00334-CR, 2003 WL 22741663, at *2 (Tex. App.—Eastland Nov. 20, 2003, no pet.) (not designated for publication). In *Andrews*, the defendant testified he "had never been in trouble before," and in response, the State then used his juvenile record to impeach him. *Id.* We concluded that this "evidence was admissible to correct the false impression left by appellant when he volunteered that he had never been in trouble before." *Id.* ("A defendant who 'opens the door' to otherwise inadmissible evidence risks having that evidence admitted and used against him at trial." (quoting *Feldman v. State*, 71 S.W.3d 738, 755–56 (Tex. Crim. App. 2002))).

B. *Relevant Background*

Here, Appellant testified as follows on direct examination:

> Q.  How -- can you tell the jurors how much you know about guns?

A. I mean, I don't -- I don't know -- I don't know too -- I don't know too much about guns. I mean, I be like a -- I be familiar with the names, but I just don't -- I don't know too much about them though.

Q. Have you had any guns before?

A. No.

Q. You had indicated that you had fired a gun over the weekend, on that Friday?

A. Yeah.

Q. Was that -- tell the jury how that came about.

A. The -- well, the -- me firing a gun that weekend, that was at --that was at -- that was at a party -- that was at a party, and we was all -- we was all-- we was already just doing our own thing, and we -- and people there -- people there had guns, so we were just shooting -- we were just shooting them.

Q. Now, you shot a gun at a party on Friday. And can you tell the jury why this sudden interest in guns?

A. I mean, well, after -- after -- after that -- after that last incident that I had when I got ran over, that's what kind of really just made me like think about -- think -- think -- think about a gun. But other than that -- other than that, I never even thought about a gun.

On cross-examination, Appellant continued to testify to his unfamiliarity and limited history with guns:

Q. Okay. So you testified yesterday that you weren't familiar with guns at all.

A. No, I'm not -- no, I'm not -- no, I'm not -- I don't know nothing about them. You're right.

Q. Your testimony was that the only time you had ever fired a gun prior to this murder was the Saturday before.

A. No, that Friday before.

Q. The Friday before.

23

The State then confronted Appellant with his juvenile adjudication for aggravated assault with a firearm, which he admitted. The trial court provided the jurors with a limiting instruction at the time the evidence was introduced and in its charge.

C. *Analysis*

Assuming but not deciding that the trial court abused its discretion in allowing the State to question Appellant about his juvenile adjudication, we have fair assurance that the error was harmless. A trial court's erroneous evidentiary ruling does not result in constitutional error; therefore, it will be disregarded, and reversal is not required, if the error did not affect the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); *see, e.g., Magana v. State*, 351 S.W.3d 501, 506–07 (Tex. App.—San Antonio 2011, pet. ref'd) (conducting a harm analysis where State inquired about appellant's prior juvenile adjudications).

A substantial right is implicated when the trial court's error had a substantial or injurious effect or influence in determining the jury's verdict. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014); *Garcia*, 126 S.W.3d at 927; *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In assessing the likelihood that the claimed error adversely affected the jury's decision, we must consider (1) the entire record, including all the evidence presented at trial, (2) the nature of the evidence supporting the jury's verdict, (3) the character of the alleged error and how it might be considered with the other evidence in the case, (4) the trial court's instructions to the jury, (5) whether the State emphasized the error, and (6) whether the evidence of the defendant's guilt is overwhelming. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Motilla v. State*, 78 S.W.3d 352, 355–58 (Tex. Crim. App. 2002); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Therefore, we will not reverse a conviction for nonconstitutional error

if, after examining the record as whole, we have fair assurance that the error did not influence the jury's verdict, or if it did, it had only a slight effect. *Barshaw*, 342 S.W.3d at 93; *Motilla*, 78 S.W.3d at 355; *Johnson*, 967 S.W.2d at 417.

In our harm analysis, we first review the entire record and assess the nature of the evidence supporting the jury's verdict. *See Gonzalez*, 544 S.W.3d at 373. As discussed previously, Appellant admitted to shooting Arellano, and the issue at trial was whether he acted in self-defense. The evidence indicated Appellant had reached out to Lewis before the shooting, asking for some "licks" and asking "[o]n who." Appellant provided Lewis with his address, and several calls were exchanged between Appellant and Lewis. Then, after the shooting, Appellant changed his account of what occurred several times and engaged in suspicious behavior, including sending a message to Lewis instructing him to delete their message exchange, allowing Carr to hide his weapon, and taking a shower before police arrived. Appellant's claim that Rodriguez and Arellano were the aggressors is complicated by his testimony that Rodriguez had handed him a loaded weapon upon his request at the outset—an inexplicable action by Rodriguez if Rodriguez was there to harm Appellant. Appellant's claim that he acted in response to Arellano first attempting to shoot him but failing when Arellano's own gun repeatedly malfunctioned was also controverted by testimony that the gun was tested for functionality and no malfunctions were detected.

Next, we assess the character of the alleged error and how it may be considered with the other evidence presented. *See id.* Here, Appellant's prior adjudication likely bore on his credibility and could be considered by the jury in the context of weighing his credibility against the credibility of Rodriguez. Moreover, because Appellant raised the claim of self-defense, credibility was central to this case. However, the State questioned Appellant regarding his prior firearm related adjudication only after Appellant "opened the door" to such inquiry by creating a

25

false impression with the jury concerning his history with and lack of familiarity with guns. The purpose of the State's questions was to clarify or correct the false impression.

We must also consider that the trial court interrupted Appellant's testimony to provide the jury with a limiting instruction upon counsel's request and that it included a limiting instruction in its guilt/innocence charge. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). Both instructions addressed and restricted the jury's use and consideration of the admitted impeachment evidence to mitigate any potential improper consideration of this evidence by the jury when assessing Appellant's credibility and deciding his guilt. The written instruction read as follows:

> During the trial, you heard evidence that the defendant may have committed a wrongful act not charged in the indictment. The [S]tate offered the evidence to rebut the defensive theory that the defendant was not familiar with firearms. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it.

> Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

It is presumed that the jury follows a trial court's instructions regarding the consideration of evidence. *Id.* Therefore, any potential harm to Appellant would be further mitigated by the trial court's limiting instruction. *See Wishert v. State*, 654 S.W.3d 317, 334 (Tex. App.—Eastland 2022, pet. ref'd); *Barron v. State*, 630 S.W.3d 392, 412–13 (Tex. App.—Eastland 2021, pet. ref'd); *Walker v. State*,

No. 11-21-00267-CR, 2023 WL 2602896, at *5–7 (Tex. App.—Eastland Mar. 23, 2023, pet. ref'd) (mem. op., not designated for publication).

Finally, we evaluate whether the State emphasized the purported error. *See Gonzalez*, 544 S.W.3d at 373. Here, the State briefly cross-examined Appellant regarding his juvenile adjudication but in its closing argument made no mention of it. Instead, the State's closing argument focused primarily on the credibility of Appellant's self-defense claim in contrast to the evidence presented, such as the text messages, the location of the shell casings recovered, the injuries sustained by the victims, emphasizing heavily Appellant's changing accounts to police.

Based on the record before us, we hold that the trial court's decision to admit the challenged evidence, even if erroneous, did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Accordingly, we overrule Appellant's fifth issue.

## VII. *Jury Argument*

In his sixth issue, Appellant argues that the trial court abused its discretion in overruling his objection to the State's punishment argument.

Permissible jury argument generally falls into one of four categories: (1) summation of the evidence; (2) reasonable deduction of the evidence; (3) answer to opposing counsel's argument; and (4) a plea for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010) (citing *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000)). Counsel is also entitled to argue the law correctly, even when it is not included in the charge. *Molina v. State*, 587 S.W.3d 100, 109 (Tex. App.—Houston [1st Dist.] 2019), *aff'd*, 632 S.W.3d 539 (Tex. Crim. App. 2021). "We examine rulings on alleged improper argument in light of the facts adduced at trial and in the context of the entire argument." *Herrera v. State*, 676 S.W.3d 896, 906 (Tex. App.—Eastland 2023, no pet.). "Even if an argument is

improper, reversal is only necessary if the statements deprived Appellant of a fair and impartial trial." *Id.*

"A prosecutorial argument is improper if it induces the jury to reach a particular verdict based upon the demands, desires, or expectations of the community." *Harris v. State*, 122 S.W.3d 871, 888 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Cortez v. State*, 683 S.W.2d 419, 421 (Tex. Crim. App. 1984)). Merely referencing the community does not constitute an improper appeal to community expectations. *Id.* (citing *Rodriguez v. State*, 90 S.W.3d 340, 365 (Tex. App.—El Paso 2001, pet. ref'd)). For example, a prosecutor urging the jury to be the voice of the community or send a message falls within the proper argument of making a plea for law enforcement. *Id.* (citing *Goocher v. State*, 633 S.W.2d 860, 864 (Tex. Crim. App. 1982)).

Appellant asserts that the State engaged in improper argument by "ask[ing] the jury to consider the effects upon the community of its decision, implying that the community demanded a significant punishment." Specifically, Appellant takes issue with the following colloquy:

> [THE STATE:] Then you heard from Agent Torrez. And Agent Torrez talked to you about gangs and told you that the defendant has been a registered member of the TMK gang here in Abilene. This gang is mostly younger people.
> What do gangs do? They get together and they commit criminal activities. Criminal activities involve murder, aggravated assault, aggravated robbery, criminal mischief. All those things are involved with gangs, firearms, drugs, those things. So we know the defendant is involved in those things.
> We know that he is a Crips. That's a division of -- TMK is a division of Crips. And we also know that since he's been in jail, that TMK gang has dissolved into something else, to another gang. Why? Because he was the leader. He was the leader of that gang in this community wreaking havoc in Abilene, Taylor County.

[APPELLANT]: Objection, Your Honor. We have a motion in limine in place based on what (inaudible) --

THE REPORTER: I'm sorry. I can't hear you.

[APPELLANT]: We have a motion in limine in place on her previous comment.

THE COURT: What's the objection to the comment?

[APPELLANT]: We have a motion in limine in place about what she said, what's going on in the community.

THE COURT: All right. Well, the objection is overruled. You can continue.

. . . .

[THE STATE]: You heard some of the most significant words that came out of Ms. Stafford's mouth were, "He's capable of behaving. He's capable of behaving in a secure environment." Where is a secure environment now? I'm sorry to say, it's prison. That's where we are. And if we want to protect this community, we want to continue to save lives --

[APPELLANT]: Your Honor, objection to that statement about wanting to protect the community. That's part of our motion in limine.

THE COURT: The objection is overruled.

[THE STATE]: We have to give him a significant sentence in prison. You have to do that. I find it very significant that, even now, the defendant is looking to blame someone else.

. . . .

[THE STATE]: We've all said there are no winners here. There are no winners. But, ladies and gentlemen, I don't want to have to be in front of someone else, another 12, talking about gangs, firearms, and murder. You get to send that message, not just to this defendant, but to others, "Not in my town."

[APPELLANT]: Your Honor, I renew my objection. Improper jury argument based on the motion in limine in place.

THE COURT: Would you like a running objection on that?

[APPELLANT]: Yes.

It is improper for the prosecutor to tell the jury that the people of the community where the crime was committed desire a particular punishment. *Cortez*, 683 S.W.2d at 420–21. As we have said, "[a]n argument by the State is improper if it induces the jury to reach a particular verdict based upon the demands, desires, or expectations of the community." *Alvarez v. State*, No. 11-14-00294-CR, 2016 WL 6998986, at *4 (Tex. App.—Eastland Nov. 30, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Cortez*, 683 S.W.2d at 421). "On the other hand, an argument constitutes a proper plea for law enforcement if it urges the jury to be the voice of the community, rather than asking the jury to lend its ear to the community." *Id.*

The State's argument here did just that—it was a plea for the jurors to be the voice of the community. The State made no reference to a particular punishment in conjunction with the community, and it did not claim that the community demanded any particular punishment. *See, e.g.*, *Lara v. State*, No. 11-22-00311-CR, 2024 WL 2751289, at *6 (Tex. App.—Eastland May 30, 2024, pet. ref'd) (mem. op., not designated for publication) (concluding argument was proper plea to community where the State asked that the jury "send a message" and did not claim that the community demanded any particular punishment); *Muskin v. State*, No. 11-19-00391-CR, 2021 WL 5934688, at *4 (Tex. App.—Eastland Dec. 16, 2021, pet. ref'd) (mem. op., not designated for publication) (concluding same where prosecutor urged the jury use its "hammer" to "send a message"); *Strong v. State*, No. 11-18-00127-CR, 2020 WL 2836999, at *6 (Tex. App.—Eastland May 29, 2020, no pet.) (mem. op., not designated for publication) (concluding same where State argued "how seriously do we take the safety of the children in this community"). Thus, the trial court did not abuse its discretion in overruling Appellant's objection to the State's closing arguments on this basis. We overrule Appellant's sixth issue.

30

## VIII.  *This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


March 12, 2026

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.